MATTHEW PODOLSKY
Acting United States Attorney for the
Southern District of New York
By:   Tara M. La Morte
      Assistant United States Attorney
      26 Federal Plaza, 38th Floor
      New York, New York 10278
      Telephone: (212) 637-1041

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
UNITED STATES OF AMERICA                          :
                                                  :     **VERIFIED COMPLAINT**
                -v.-                              :     **FOR FORFEITURE**
                                                  :
316 BITCOIN TRANSFERRED TO THE                    :
GOVERNMENT'S CUSTODY ON OR ABOUT                        25 Civ. 2086
OCTOBER 1, 2020,                                  :
                                                  :
                Defendant-*in-rem*.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Plaintiff United States of America, by its attorney Matthew Podolsky, Acting United States Attorney for the Southern District of New York, for its verified complaint, alleges, upon information and belief, as follows:

## I.  JURISDICTION AND VENUE

1. This action is brought pursuant to Title 18, United States Code, Section 981 by the United States of America seeking the forfeiture of 316 Bitcoin transferred to the Government's custody on or about October 1, 2020 (the "Defendant-*in-rem*").

2. This Court has jurisdiction pursuant to Title 28, United States Code, Section 1355.

3. Venue is proper under Title 28, United States Code, Section 1355(b)(1)(A) because certain actions and omissions giving rise to forfeiture took place in the Southern District of New York.

4. The Defendant-*in-rem* constitutes property involved in a violation of engaging in monetary transactions in property derived from specified unlawful activity, Title 18, United States Code, Sections 1957 and 2 and are thus subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(A).

## II. BACKGROUND

A. Bitcoin

5. Bitcoin are an anonymous, decentralized form of electronic currency, existing entirely digitally and not in any physical form. The currency is not issued by any government, bank, or company, but rather is generated and controlled automatically through computer software operating on a "peer-to-peer" network. Bitcoin transactions are processed collectively by the computers composing the network.

6. To acquire Bitcoin in the first instance, a user typically must purchase them from a Bitcoin "exchanger." In return for a commission, Bitcoin exchangers accept payments of currency in some conventional form (cash, wire transfer, etc.) and exchange the money for a corresponding number of Bitcoin, based on a fluctuating exchange rate. Exchangers also accept payments of Bitcoin and exchange the Bitcoin back for conventional currency, again, charging a commission for the service.

7. Once a user acquires Bitcoin from an exchanger, the Bitcoin are kept in a "wallet" associated with a Bitcoin "address," designated by a complex string of letters and numbers. (The "address" is analogous to the account number for a bank account, while the


"wallet" is analogous to a portfolio of bank accounts, since a single "wallet" can contain multiple "addresses.")  Once a Bitcoin user funds his wallet, the user can then use Bitcoin in the wallet to conduct financial transactions, by transferring Bitcoin from a Bitcoin address within that "wallet" to the Bitcoin address of another user, over the Internet.

8. All Bitcoin transactions are recorded on a public ledger known as the "Blockchain," stored on the peer-to-peer network on which the Bitcoin system operates. The Blockchain serves to prevent a user from spending the same Bitcoin more than once. However, the Blockchain only reflects the movement of funds between anonymous Bitcoin addresses and therefore cannot by itself be used to determine the identities of the persons involved in the transactions. Only if one knows the identities associated with a Bitcoin address involved in a set of transactions is it possible to meaningfully trace funds through the system.

9. Bitcoin are not illegal in and of themselves and have known legitimate uses. However, Bitcoin are also known to be used by criminals for money-laundering purposes, given the ease with which they can be used to move money anonymously.

B. Silk Road

10. In or around October 2013, U.S. law enforcement seized a Dark Web site known as "Silk Road," where illegal drugs and other illicit goods and services were regularly bought and sold by the site's vendors and customers, and arrested its owner and operator, Ross William Ulbricht, a/k/a "Dread Pirate Roberts," a/k/a "DPR," a/k/a "Silk Road." Ulbricht was convicted after a jury trial in February 2015 of various offenses including narcotics distribution and money laundering, stemming from his operation of Silk Road from in or about January 2011, up to and including in or about September 2013. The

President of the United States pardoned Ulbricht on or about January 21, 2025. In addition, on or about September 13, 2013, the United States commenced a civil forfeiture action seeking the forfeiture of any and all assets of Silk Road and any and all property traceable thereto, including but not limited to the Bitcoin located on Ulbricht's computer hardware (the "2013 Civil Forfeiture Action"). *See United States v. Ulbricht*, No. 13 Civ. 6919 (Dkt. No. 4). Other than Ulbricht, no person or entity filed a verified claim in the 2013 Civil Forfeiture Action, and on or about September 29, 2017, the Court entered stipulation pursuant to which Ulbricht withdrew his verified claim and dismissed it with prejudice, while the United States obtained a final order of forfeiture as to Bitcoin contained in wallet files residing on certain computer hardware belonging to Ulbricht. *See id.* (Dkt. No. 46). Evidence introduced at Ulbricht's trial and in related proceedings demonstrated the following:

      a.    Silk Road was designed to be an online criminal marketplace outside the reach of law enforcement or governmental regulation. First, Ulbricht operated Silk Road on what is known as "The Onion Router" or "Tor" network ("Tor"), a special network on the Internet designed to make it practically impossible to physically locate the computers hosting or accessing websites on the network. Second, he required all transactions on Silk Road to be paid with Bitcoin.

      b.    During its two-and-a-half years in operation, Silk Road was used by several thousand drug dealers and other unlawful vendors to distribute hundreds of kilograms of illegal drugs and other illicit goods and services to well over a hundred thousand buyers, and to launder hundreds of millions of dollars deriving from these unlawful transactions. All told, the site generated sales revenue totaling over approximately 9.5 million Bitcoin.

C. Silk Road's Bitcoin-Based Payment System

11. The only form of payment accepted on Silk Road was Bitcoin.

12. Silk Road's payment system essentially consisted of a Bitcoin "bank" internal to the site, where every user had to hold an account in order to conduct transactions on the site.

13. Specifically, every user on Silk Road had a Silk Road Bitcoin address, or multiple addresses, associated with the user's Silk Road account. These addresses were stored on wallets maintained on servers controlled by Silk Road.

14. In order to make purchases on the site, the user first had to obtain Bitcoin (typically from a Bitcoin exchanger) and send them to a Bitcoin address associated with the user's Silk Road account.

15. After thus funding his account, the user could then make purchases from Silk Road vendors. When the user purchased an item on Silk Road, the Bitcoin needed for the purchase were held in escrow (in a wallet maintained by Silk Road) pending completion of the transaction.

16. Once the transaction was complete, the user's Bitcoin were transferred to the Silk Road Bitcoin address of the vendor involved in the transaction. The vendor could then withdraw Bitcoin from the vendor's Silk Road Bitcoin address, by sending them to a different Bitcoin address, outside Silk Road, such as the Bitcoin addresses the vendor personally controls.

D. Criminal Complaint Filed Against Jonathan Warren

17. On or about June 11, 2019, a criminal complaint (the "Criminal Complaint")

was filed against Jonathan Warren ("Warren") alleging there was probable cause for the arrest of Jonathan Warren for conducting monetary transactions in property derived from specific unlawful activities in violation of Title 18, United States Code, Section 1957. The Criminal Complaint is incorporated by reference and attached hereto as Exhibit A.

18.  As set forth in the Criminal Complaint, the investigation into Warren revealed the following:

 a.  Warren opened an account with a securities broker-dealer that offers market making services for various cryptocurrencies ("Broker-1") in December 2017.

 b.  Warren engaged in his first trade with Broker-1 on or about January 5, 2018, by attempting to sell approximately 578 Bitcoin through Broker-1 at a price of $16,600, for a total of $9,600,000. Warren requested that the money be deposited into bank account in his name.

 c.  Broker-1 accepted delivery of the purchased Bitcoin and thereafter analyzed the Blockchain to determine the origin and provenance of Warren's Bitcoin.

 d.  Based on that analysis, Broker-1 determined that the approximately 578 Bitcoin delivered to Broker-1 came from two separate Bitcoin addresses: 306 Bitcoin from the blockchain cluster with the root address ending in -vcMrwRcx ("Warren Wallet-1")[1] and 272 Bitcoin from the address ending in -hq2nBtP6 ("Warren Wallet-2").

 e.  Broker-1 determined that Warren Wallet-1 had a direct connection with

---

[1] A cluster of addresses on blockchain is determined by the input addresses used for the same transaction. That is, the addresses are all used simultaneously to send money to the same destination address. In order to execute such a transaction, a user would need the private key for each sending address, which indicates that the addresses are controlled by the same individual and likely as part of the same wallet file. The cluster is then referred to by the first address used within the cluster of transactions. Here, Warren Wallet-1 consists of four separate addresses, with the root address ending in -vcMrwRcx as the first address used.

Silk Road and that it had received approximately 316 Bitcoin from Silk Road. It also determined that Warren Wallet-2 was an address that represented a withdrawal from Mt. Gox, but had sent 32 Bitcoin to Silk Road.

      f.      In documentation to Broker-1, Warren represented that he had purchased the Bitcoin that he sought to sell from Mt. Gox in 2011 and 2012.

      g.      Broker-1 informed Warren of these connections to Silk Road and that, because of those connections, it would not carry out the purchase. Specifically, in an email to Warren, Broker-1 informed him that it "ran [his] wallet address through our forensic blockchain analytical tools. The result was a direct connection to an address known through court records to be part of the Silk Road criminal case." Broker-1 further informed Warren that:

> [W]e are obligated by US law not to facilitate money laundering and can face very serious consequence for failing in these obligations. It is possible that the connection of your wallet address to Silk Road may be inadvertent or innocent. However, we unfortunately cannot move forward with the transaction. Our banking partners, our regulators, and potentially law enforcement agencies simply would not give us the presumption of an innocent connection if we complete the transaction by wiring you the proceeds of $9,600,000.

      h.      Instead of completing the transaction, Broker-1 informed Warren it would return the Bitcoin to Warren. Broker-1 asked Warren to specify which of the two addresses Broker-1 could use for the purpose of returning the Bitcoin. Instead, Warren provided a third address, ending in -PbBLEBFV ("Warren Wallet-3").

      i.      On or about January 8, 2018, Broker-1 refunded 578 Bitcoin to Warren Wallet-3.

      j.      Analysis of Broker-1's records conducted by federal law enforcement

agents revealed that the source of Warren's Bitcoin accurately reflected the records publicly available in the Blockchain.

   k. Between in or about February 2012 and December 2012, over the course of approximately eight transactions, approximately 316 Bitcoin were transferred from Silk Road into Warren Wallet-1.

   l. The Silk Road account that transferred those 316 Bitcoin to Warren Wallet-1 was an account with the moniker "Raffael." Between in or about June 2011 and in or about December 2012, the Raffael Silk Road account sold prescription drugs, including Adderall, Clonazepam, and Duloxetine.

   m. In the time it was active, the Raffael Silk Road account engaged in finalized orders of drugs sales totaling approximately 534 Bitcoin.

   n. After Warren's attempted transaction with Broker-1 was rejected and he caused the Bitcoin to be returned to him in Warren Wallet-3, the Blockchain no longer reflected the connection of the Bitcoin to Silk Road. This is so because the serialized chain of transactions had been broken by the use of a new, "clean" wallet, and the provenance of the 316 Bitcoin was concealed.

   o. Based on a review of business records from an exchanger of Bitcoin and other digital currency ("Exchange-1"), it was revealed that, on or about January 16, 2018, Warren moved the approximately 578 Bitcoin from Warren Wallet-3 to an Exchange-1 account, where he exchanged it for approximately $6,565,513.81, which was subsequently deposited into his Charles Schwab bank account ending in account number 4449.

   p. Because the Bitcoin in Warren Wallet-3 did not reflect any connection to Silk Road or to their origin as narcotics proceeds, Exchange-1 completed the exchange.

### III. THE DEFENDANT-*IN-REM*

19. On or about September 9, 2020, Warren entered into a Deferred Prosecution Agreement (the "DPA") with the United States with respect to his conduct relating to the money laundering scheme described above. Under the DPA, Warren agreed to transfer 316 Bitcoin to the Government representing the property involved in the scheme described above. Pursuant to the DPA, Warren also agreed, pursuant to Title 18, United States Code, Section 981(a)(1)(A), to the civil forfeiture of the 316 Bitcoin transferred to the Government and that the 316 Bitcoin would serve as a substitute *res* for the property involved in the scheme.

20. On or about October 1, 2020, Government received the Defendant-*in-rem* from Warren and the Defendant-*in-rem* is in the custody of the Government.

21. The DPA and the accompanying Statement of Facts are attached hereto as Exhibit B.

### IV. CLAIM FOR FORFEITURE

22. Incorporated herein are the allegations contained in paragraphs one through twenty-one of this Verified Complaint.

23. Title 18, United States Code, Section 981(a)(1)(A) subjects to forfeiture "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of section 1956, 1957 or 1960 of this title, or any property traceable to such property."

24. By reason of the foregoing, the Defendant-*in-rem* is subject to forfeiture to the United States of America pursuant to Title 18, United States Code, Section 981(a)(1)(A), because the Defendant-*in-rem* constitutes property involved in monetary transactions in property derived from specified unlawful activity, to wit, illegal narcotics trafficking.

WHEREFORE, plaintiff United States of America prays that process issue to enforce the forfeiture of the Defendant-*in-rem* and that all persons having an interest in the Defendant-*in-rem* be cited to appear and show cause why the forfeiture should not be decreed, and that this Court decree forfeiture of the Defendant-*in-rem* to the United States of America for disposition according to law, and that this Court grant plaintiff such further relief as this Court may deem just and proper, together with the costs and disbursements of this action.

Dated: New York, New York
     March 13, 2025

                          MATTHEW PODOLSKY
                          Acting United States Attorney for the
                          Southern District of New York
                          Attorney for the Plaintiff
                          United States of America

By: _____
                          TARA M. LA MORTE
                          Assistant United States Attorney
                          26 Federal Plaza, 38th Floor
                          New York, New York 10278
                          Telephone: (212) 637-1041

## **VERIFICATION**

STATE OF NEW YORK )
COUNTY OF NEW YORK :
SOUTHERN DISTRICT OF NEW YORK )

ROBERT J. VANECEK, being duly sworn, deposes and says that he is a Special Agent with the Drug Enforcement Administration, and as such has responsibility for the within action; that he has read the foregoing complaint and knows the contents thereof, and that the same is true to the best of his knowledge, information, and belief.

The sources of deponent's information on the ground of his belief are official records and files of the United States, information obtained directly by the deponent, and information obtained by other law enforcement officials, during an investigation of an alleged violation of Title 18, United States Code, Sections 1957 and 2.

Robert J. Vanecek
Special Agent
Drug Enforcement Administration